# Table of Contents

**Exhibit 1** – Master Service Agreement Between Insurance Supermarket, Inc. ("ISI") and EDM Leads, LLC ("EDM").  ...................................................... 1-17

# EXHIBIT 1

DocuSign Envelope ID: 3509DC79-C5F4-4EBC-A7BA-97649E4094B9



EXHIBIT 1

# MASTER SERVICES AGREEMENT

This MASTER SERVICES AGREEMENT (the "MSA") is entered into as of the signature latest in time on the MSA (the "Effective Date"), by and between __EDM Leads LLC__, a __Limited Liability__ company, and its applicable affiliates and subsidiaries ("Service Provider"), having its principal place of business at __1166 E Warner Rd, Gilbert, AZ 85296__, and **Insurance Supermarket Inc.** ("ISI"), a Delaware corporation, having its principle place of business at 1951 NW7TH Ave, #600, Miami FL. ISI and Service Provider may be referred to individually as a "Party" and collectively as the "Parties." Together, this MSA, with any applicable Insertion Order/s/ (or IO/s/) (as defined below), constitute the "Agreement."

## RECITALS

**WHEREAS**, ISI desires to retain the services of Service Provider, and Service Provider desires to provide certain services for ISI, on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Service Provider is a provider of certain lead generation, consumer contact, and online marketing services as set forth in this Agreement or an applicable IO (defined below) and ISI seeks to engage Service Provider and make use of the Services, on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises and obligations set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **DEFINITIONS.**

   a. "Deliverables" means ultimate result of the Services made available by Service Provider to ISI under the terms of this Agreement potentially including, but not limited to, analytics, creatives, or other such materials including but not limited to specific instances of reports, documents and data generated through the provision of Services.

   b. "Fees" means the fees, costs, expenses and other compensation for the Services, as described herein, and/or set forth in the IO(s).

   c. "Insertion Order" or "IO" means those certain separate or attached written document(s) titled, substantially, Insertion Order, entered into and executed by both Parties hereto and which incorporates this Agreement by reference. IOs shall set forth the specific Services (defined below) to be provided, and may set forth additional terms such as the deliverables, scope, duration, responsibilities, fees, payment terms, and other details applicable to such Services (defined below).

   d. "Intellectual Property" means any patent, patent application, patentable subject matter, know-how, copyright, copyrightable subject matter, moral right, trade name, trademark, service mark, trade secret, design right, and any applications or right to apply for registration therefore, computer software programs or applications, tangible or intangible proprietary information, or any other intellectual property right, in any media, whether registered or unregistered or in draft or final form, along with the structure, materials, results, data, consumer information, organization, methods, strategies, and code used in conjunction with or otherwise related to the Services. This shall include the foregoing whether first made or created before or after the Effective Date.

DocuSign Envelope ID: 3509DC79-C5F4-4EBC-A7BA-97649E4894B9



EXHIBIT 1

e.  "ISI Data" means all information, data, and other content, in any form or medium, that is submitted, posted, or otherwise transmitted by or on behalf of ISI, including but not limited to scripts, creative materials, display graphics, slogans, claims, trademarks or other intellectual property, infographics, or other such advertisements to Service Provider for purposes contemplated by this Agreement and any applicable Insertion Order.

f.  "Lead(s)" means certain consumer actions including, without limitation, clicks, impressions, purchases, registrations, and/or submission of consumer data, in whole identical form, and not individual part gathered, provided, or otherwise obtained under this Agreement.

g.  "Qualifying Factor" means any categories, factor, qualification, financial standard or any other such information required to be part of a Lead or Deliverable and which is required to determine whether or not a Lead is a "Qualified Lead."

h.  "Qualified Lead" means a Lead or Deliverable provided to ISI which meets the specifications set forth in any applicable IO as a Qualifying Factor in all material respects.

i.  "Services" means the services and/or goods described in the IO(s) potentially including, but not limited to: a) direct to consumer email traffic, b) Short Message Service ("SMS") texting, c) direct to consumer calls, d) subscription marketing services, and e) traffic derived from websites. Services shall not include any services other than those described herein or as agreed to by the Parties in writing in any applicable IO.

j.  "Service Provider Systems" means the certain software, data, databases, exchanges, security access or other materials, technologies or services Service Provider provides to ISI for the sole purpose of assisting ISI to participate in the program, Hosted Services and/or the Services.

k.  "Vendor" means any vendor, sub-vendor, sub-affiliate or subcontractor of Service Provider that generates or delivers Leads to Service Provider, provides fulfillment services to Service Provider, or any other such third party contracted with Service Provider to provide support or goods/services to Service Provider related to the Deliverables.

2.  **SERVICES**

a.  <u>Services</u>. Service Provider agrees to perform for ISI the Services specified in any IO signed by duly authorized representatives of both Parties that expressly references and incorporates this Agreement. This Agreement will specifically supersede any terms and conditions executed prior to or after the Effective Date of this Agreement. In the event of conflict between this Agreement and any related IO, the Agreement shall control.  Unless expressly provided for within a given IO, for any two or more related IOs with conflicting terms, the IO most recent in time shall govern. No click-through, click-wrap, online, purchase order, or other terms provided by Service Provider shall serve to modify or supersede this Agreement and any such terms shall not bind ISI unless expressly and specifically accepted in signed writing. A check-box, "acceptance by use" or "automatic" acceptance of such terms provided by Service Provider shall not constitute sufficient acceptance and shall not bind ISI.

DocuSign Envelope ID: 3509DC79-C5F4-4EBC-A7BA-97649E4B94B9



EXHIBIT 1

b. <u>Deliverables</u>. Subject to any and all applicable laws (including but not limited to those enacted to protect consumer privacy or other rights), Service Provider hereby grants ISI the right to access and use the Deliverables in accordance with the terms and conditions herein and solely for the specific marketing campaign as set forth in the Insertion Order. ISI hereby agrees, represents, and warrants that it shall not resell, transfer, share, or otherwise sell any Deliverables provided hereunder unless specifically agreed to by both Parties in the applicable Insertion Order. ISI further agrees, represents, and warrants that ISI shall not append any Lead or Deliverable, in whole or part, to additional data for the purpose of later use and/or monetization unless specifically agreed to by both Parties in the applicable Insertion Order. Deliverables hereunder shall be subject to all rights and licenses by third parties to Third-Party Products, potentially including, but not limited to, analytics, creatives, or other such materials other than Lead(s); provided, however, that Service Provider is and shall remain the owner of any templates, analytic methods, procedures, processes or technology and all associated intellectual property rights used to create such Deliverables. Furthermore, each Party shall reasonably cooperate with the other Party to enable the exercise of consumer rights as set forth in any applicable law.

c. <u>ISI Materials</u>. Except as explicitly contemplated herein or in any applicable IO or amendment hereto, ISI acknowledges and agrees that Service Provider is not a party to or an agent of any transactions conducted between ISI and third-parties. If Service Provider has a dispute with a customer, or suffers any harm arising out of or connected with any customer, Service Provider hereby waives all claims against and releases ISI and its personnel from any and all liability for claims, demands, damages (actual and consequential), costs and expenses (including litigation costs and attorneys' fees) of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way connected with the Services.

d. <u>International Deliverables</u>. The Parties acknowledge and agree that except as expressly provided in this Agreement and any applicable IO, no Deliverable shall include data relating to or originating from third-parties located or residing outside the United States. In the event that such a Deliverable is contemplated or contained in this Agreement or an applicable IO, the Parties shall first execute a Data Protection Addendum ("DPA") governing the use of such data and no such data may be contained in any Deliverable until the execution of said DPA is complete.

3. **<u>RESPONSIBILITIES</u>**

**3.1 ISI Responsibilities**

a. <u>ISI Data</u>. ISI shall provide all ISI Data to Service Provider by the start date set forth in the Insertion Order or as otherwise agreed to in writing by the Parties.

b. ISI hereby represents and warrants that it will comply with all applicable laws

c. <u>General</u>. ISI is responsible and liable for all uses of the Services, Leads and Deliverables resulting from access provided by ISI, directly or indirectly, whether such access or use is permitted by or in violation of this Agreement. Without limiting the generality of the foregoing, each Party is responsible for all acts and omissions of its authorized users, and any act or omission by an authorized user that would constitute a breach of this Agreement if taken by Client will be deemed a breach of this Agreement by Client. Client shall use reasonable efforts to make all authorized users aware of this Agreement's provisions as

DocuSign Envelope ID: 3509DC79-C5F4-4EBC-A7BA-97649E4094B9

EXHIBIT 1



applicable to such authorized user's use of the Services and shall cause authorized users to comply with such provisions.

d. <u>Notice of Non-Conformity</u>. ISI agrees to notify Service Provider of any non-Qualified Leads and/or Deliverables in writing providing Service Provider with documentation of such non-conformity to enable Service Provider to verify the same. Failure to do so shall not waive ISI's right to dispute such Leads and/or Deliverables. Failure to provide such notice does not constitute ISI's waiver of the non-conformance.

**3.2 Service Provider Responsibilities**

a) Service Provider will assure that the Lead Provider Telephone Numbers Advertisements, properly function and direct an End Consumer to Purchaser offering information on insurance products.

b) Service Provider hereby represents and warrants that it will comply with all applicable laws.

c) Service Provider represents and warrants that the Service Provider has all necessary permits, licenses and clearances to operate Service Provider websites and to use the content contained in any of the Services provided by Service Provider.

d) Services provided will not be false or misleading and will not contain any content that is in any way libelous, harmful, obscene, harassing, or racially, ethnically, or otherwise objectionable to a reasonable person.

e) Services do not and will not contain any viruses, Trojan horses, worms, time bombs, spyware or other malware.

f) <u>TCPA Compliance</u>. Service Provider agrees to provide ISI constant access to Service Provider's database of consumers and consumer information (including, but not limited to, full name, telephone number, and email address) who have informed Service Provider that they no longer wish to be contacted by or on behalf of Service Provider including, but not limited to, opt-outs, aggregations of consumer opt-outs, Federal Trade Commission's Do-Not-Call List consumers, do-not-email lists, Service Provider's internal Do-Not-Call list, and any other such information ("**DNC List**") and to separately and individually provide such DNC List to ISI prior to the start of any each Insertion Order. Service Provider shall maintain and keep updated the DNC List on a daily basis and notify ISI of any updates to such DNC List. Service Provider, without limitation, represents and warrants that the information contained in the DNC List is accurate, up to date, and can be relied upon by ISI in performance of the Services. Further, Service Provider shall individually inform ISI of and when Service Provider receives such additions to its DNC List.

g) <u>CCPA Compliance</u>. Service Provider shall promptly, but in no event later than five business days forward any request by a consumer to exercise a right under the California Consumer Privacy Act of 2018 ("CCPA") or its implementing regulations to ISI. Service Provider shall cooperate with ISI in order for ISI or Service Provider, as decided by mutual agreement, to respond to a consumer within forty-five (45) days of the receipt of a consumer request, such cooperation shall include but is not limited to a search of, access to specific pieces of, deletion of, and limitation on the sale of Personal Data (as defined by the CCPA).

h) Service Provider shall develop or procure systems, methods, and processes to measure or otherwise count all calls, and their duration and shall report to ISI on a regular basis. The amount and duration of

**Insurance Supermarket Inc.**
1951 NW 7th Ave, #600, Miami FL 33136



EXHIBIT 1

calls shall be measured and reported by Service Provider. Service Provider agrees that it will transfer the information to ISI's thirty-party system known as Retreaver, or any system equivalent thereof throughout the Term of the Agreement, to allow ISI to review the reported information on a regular basis.

i)  Service Provider will ensure at the time of delivery of any Leads to ISI, the Lead is delivered with either a valid Trusted Form certificates and/or Jornaya tokens or any other form of recognized certification as ISI deems as acceptable.  In the event the Service Provider is unable to do so, Service Provider must ensure that it has on record a valid Trusted Form certificate or a Jornaya token for each Lead provided to ISI, should ISI request proof and validation.

j)  Service Provider shall ensure that it has obtained and recorded the affirmed consent of any and all customers sold to ISI prior to ISI's initial contact with the customer.  Upon written request by the Purchaser, Lead Provider shall provide proof of the consent of which shall not be unreasonably withheld or without undue delay.

4.  **FEES; PAYMENTS**.

a.  <u>Fees</u> ISI shall pay Service Provider the fees for the Services set forth in the applicable IO  in accordance with this Agreement ("Fees"). Such Fees may include, but are not limited to, amounts due on a Cost Per Action ("CPA"), Cost Per Impression ("CPI"), or Cost Per Click ("CPC") basis.

b.  <u>Payment</u>. Service Provider shall invoice ISI for Fees due under this Agreement on a monthly basis. ISI shall pay all amounts indicated on each validly submitted and undisputed invoice within the earlier of thirty (30) days of receipt of the invoice or the time period set forth in the IO(s). All payments from ISI to Service Provider shall be in United States Dollar (USD). In the event of a termination of this Agreement and/or any IO(s), ISI agrees to pay accrued amounts due to Service Provider or amounts which would have been billed or would accrue post termination as a result of Services already performed in whole or in part (including but not limited to Deliverables or Services for which Service Provider has earned Fees as set forth in any relevant IO).

c.  <u>Taxes</u>. Each Party is responsible for the payment of its own taxes in relation to this Agreement and any IO thereunder and all Fees or other amounts payable under this Agreement are exclusive of taxes or similar assessments. Neither Party shall be responsible for the payment of any taxes of the other Party. However, where applicable law requires or permits a Party to collect taxes from the other Party (for example, any Value Added Tax), nothing in this Agreement shall prevent such collection in accordance with the requirements of said law.

d.  <u>Reporting</u>. Except as otherwise provided in the IO(s) applicable to specific Services, each Party shall track the applicable metrics, costs, actions, or other information relevant to the applicable IO. ISI shall have the right to dispute Service Provider reporting, so long as ISI submits such dispute in writing to Service Provider no more than 10 days from the date upon which a report is provided by Service Provider. ISI reserves the right to resolve any such dispute in ISI's good faith discretion, and to supersede Service Provider's reporting with ISI's reporting. At all times, ISI's reporting shall control where available.

5.  **TERM.** This Agreement shall commence on the Effective Date and shall remain in effect for a period of one year ("Initial Term"). Upon expiration of the Initial Term, this Agreement shall automatically renew for successive one year terms ("Renewal Terms") (the Initial Term and any Renewal Term shall collectively be referred to herein as the "Term") unless either Party provides written notice of its intent to terminate at least 30 days prior to the expiration



EXHIBIT 1

of the then-current Initial Term or Renewal Term or unless terminated earlier as provided herein. ISI reserves the right to terminate this Agreement, or any individual IO(s) hereunder, upon written notice to Service Provider. Where an IO does not specify the dates of service or does not have an end date, it shall automatically terminate within 30 days. Notwithstanding the foregoing, this Agreement or any Insertion Order hereunder may be terminated by either Party immediately upon (a) written mutual agreement of the Parties, (b) a material breach of this Agreement that is not cured pursuant to the terms of this Agreement or in any case upon 30 days written notice detailing such breach and an intent to terminate, (c) the bankruptcy, insolvency or liquidation of either Party, (d) if either Party ceases to conduct business or makes assignment for the benefit of its creditors, (e) the occurrence of a breach of confidentiality as described in this Agreement, (f) the transfer of ownership interest in ISI, or (g) where further performance under this Agreement or related IO would be contrary to any law, regulation or statute to which a Party is subject.

6.  **RELATIONSHIP OF THE PARTIES.** The Parties acknowledge and agree that no relationship other than that of an independent contractor relationship has been created by this Agreement. Without limitation, the Parties are not partners nor in a joint venture of any kind. Nothing in this Agreement or any IO thereunder shall have the effect that any Party's affiliates, officers, directors, employees, agents, or representatives shall be deemed to be an affiliate, officer, director, employee, agent, or representative of the other Party for any purpose. Each Party shall be solely responsible for the payment of all compensation to its employees, including provisions for employment taxes, worker's compensation and any similar taxes associated with employment of the respective Party's personnel.

7.  **CONFIDENTIALITY.** The Parties acknowledge that, during the term of this Agreement, they may disclose certain Confidential Information of a special and unique nature to eachother.

    a.  Definition. As used in this Agreement, "Confidential Information" means any and all information disclosed by one Party to another (whether or not labelled as "Confidential," "Proprietary," or equivalent), regardless of the form of disclosure (including but not limited to by way of writing, orally, electronically, visually or by inspection of tangible objects or computer coding), including but not limited to: any information which consists of or constitutes personal data or personal information of third-parties as defined by applicable law, information that would be regarded as confidential by a reasonable business person relating to this Agreement or any related IO(s); any and all technical and non-technical information provided by either Party to the other; patent and patent applications; intellectual property; trade secrets; proprietary information; mask works; ideas; media; techniques; sketches; drawings; works of authorship; models; inventions; know-how; processes; apparatuses; equipment; algorithms; databases; software programs; software source documents; formulae related to the current, future, and proposed products and services of each of the parties and including, without limitation, their respective information concerning vendors, sourcing, research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, marketing plans and information the disclosing party provides regarding third parties. "Confidential Information" shall also mean all data, reports, analyses, compilations, studies, interpretations, forecasts, records or other materials (in whatever form maintained, whether documentary, computer storage or otherwise) prepared by the Party receiving the information that copy, contain, are derived from or otherwise reflect or are based upon, in whole or in part, any Confidential Information of such Party or that reflect the review of, interest in, or evaluation of all or any portion of this Agreement or any related IO(s), respective directors, shareholders, employees, financial advisors, lenders,

DocuSign Envelope ID: 3509DC70-C5F4-4EBC-A7BA-97649E4094B9



EXHIBIT 1

accountants, attorneys, agents, equity investors or controlling persons. and relates to matters such as the Parties' (or the Parties' clients') trade secrets, files, policies, computer and other databases and libraries, techniques, plans, strategies, existence of this Agreement, status of Service Provider as a vendor of ISI, contracts, systems, records, accountings, procedures, forms, manuals, reports, processes, products, publications, services, employees, customer lists, personally identifiable information of customers, identities, or any other information, whether in written, verbal, electronic, or other format or in draft or final form, that is either (1) marked or identified as being confidential, or (2) that a reasonable person would understand to be confidential from the nature of the information or the circumstances of the disclosure, as well as the nature and extent of the collaboration.

b.  <u>Restrictions on Use or Disclosure</u>. Both Parties acknowledge that either may receive Confidential Information from the other during the Term of this Agreement. Each Party covenants and agrees that neither it nor its affiliates, employees, officers, directors, representatives or agents shall at any time during or following the Term of this Agreement, either directly or indirectly, (1) disclose to any person, organization, or entity in any manner whatsoever any Confidential Information, or (2) use any Confidential Information for any purpose whatsoever, except as strictly necessary to perform under this Agreement. Each Party shall restrict disclosure of the Confidential Information to its employees with a need to know such information in order to perform under this Agreement and shall advise such employees of their obligations with respect to the Confidential Information.

c.  <u>Duties; Remedies</u>. Each Party shall protect the other Party's Confidential Information using the same standard of care it uses to protect its own confidential and proprietary information, but in any event not less than a reasonable standard of care. Each Party (the "Receiving Party") shall immediately notify the other Party the ("Disclosing Party") in writing in the event of any unauthorized use or disclosure of the Confidential Information and assist in remedying such unauthorized use or disclosure, as requested by the Disclosing Party (which shall not limit other remedies of the Disclosing Party as provided herein or by applicable law). In the event of a breach or threatened breach of this Confidentiality Section, the Disclosing Party, in addition to and not in limitation of any of the rights, remedies or damages available to it at law or in equity, shall be entitled to a temporary or permanent injunction to prevent or restrain any such breach by the Receiving Party.

d.  <u>Ownership</u>. All Confidential Information shall be and remain the property of the Disclosing Party notwithstanding the subsequent termination of this Agreement. The Receiving Party shall, within 30 days of the Disclosing Party's written request, return all Confidential Information (including any copies thereof) or certifyin writing (by an authorized officer) that all Confidential Information (including any copies thereof) has been destroyed.

e.  <u>Exceptions</u>. Notwithstanding the foregoing, Confidential Information does not include information that: (1) is or becomes public domain information or material through no fault or breach on the part of the Receiving Party; (2) as demonstrated by the written records of the Receiving Party, was already lawfully known (without restriction on disclosure) to the Receiving Party prior to the information being disclosed to the Receiving Party by the Disclosing Party or any representative of the Disclosing Party; (3) has been or is hereafter rightfully furnished to the Receiving Party without restriction on disclosure by a third person lawfully in possession thereof; (4) has been independently developed, by or for the Receiving Party, without reference to the Confidential Information of the Disclosing Party and without any breach or violation of any obligation of this Agreement; (5) is required to be disclosed by court order, provided that the Receiving Party notifies the Disclosing Party so that the Disclosing Party may have a reasonable opportunity to obtain a protective order or other form of protection against disclosure; or (6) is aggregated



EXHIBIT 1

by a Party in such a manner as to not specifically identify the other Party.

f.  <u>Information as to Vendors</u>. Any legal or compliance information furnished by Service Provider to ISI may have the name/identity and URLs of Vendors redacted, provided, however, that Service Provider may furnish to ISI the name/identity and URLs of a Vendor that Service Provider determines has failed or may have failed to comply with an applicable law in connection with Leads sold to ISI pursuant to this Agreement.

g.  <u>Publicity Rights</u>. Neither Party will, without the prior written consent of the other Party: (i) issue any press releases, marketing literature, public statements, or in any way engage in any other form of public disclosure relating to this Agreement, including to the relationship of the Parties; (ii) use the other Party's registered or trade name (including and contraction or abbreviation of that name) or trademarks (including but not limited to a Party's brand names, domains, trademarks, service marks and trade names licensed or owned by a Party or Party's affiliate; or (iii) otherwise imply any endorsement by one Party of the other or the other Party's business.

h.  <u>Third Parties</u>. Both Parties agree to ensure that any employees, affiliates, contractors, employees, officers, directors, owners, or agents ("Personnel") of the respective Party along with any other third-party who receives Confidential Information from the respective Party shall be bound by obligations of confidentiality no less restrictive than those contained in this Section prior to receiving said Confidential Information.

8.  **INTELLECTUAL PROPERTY.**

a.  <u>General</u>. Except as expressly set forth herein or in an IO hereunder, neither Party intends and this Agreement shall not convey, assign, transfer, grant, or otherwise give any right, title, interest, license, ownership, or other such interest in the Intellectual Property of one Party to the other Party.

b.  <u>Suggestions and Feedback</u>. Service Provider hereby grants ISI a royalty-free, worldwide, transferable, sub licensable, irrevocable, perpetual license to use or incorporate into its services any suggestions, enhancement requests, recommendations or other feedback provided by Service Provider relating to the operation of ISI or is offerings ("Feedback") provided that (i) Confidential Information of Service Provider will not be considered Feedback, and (ii) all Feedback provided to ISI "AS IS" and without any warranty of any kind, express or implied, and under no circumstances will Licensee have any liability whatsoever to ISI with respect to the Feedback or its use.

9.  **INDEMNIFICATION.**

a.  <u>Indemnification by Service Provider</u>. Service Provider shall indemnify, defend, and hold ISI, its vendors, affiliates, directors, officers, employees, suppliers, agents, successors, and assigns harmless from and against all actual or alleged direct liabilities, losses, costs, claims, expenses, (including reasonable attorney's fees), and damages of any kind relating to or arising from or in connection with alleged or actual infringement by the Service Provider of a third party's intellectual property rights or other rights in connection with the supply or performance of Services under the Agreement; (ii) any act or omission related to Service Provider's performance of its obligations or failure to perform its obligations under this Agreement and any applicable IO, (ii) any failure by Service Provider to comply with representations and warranties hereunder; (iv) any and all violation of law, rule, regulation, or other such binding legal authority by Service Provider; or (vi) Service Provider's infringement of the Intellectual Property of any



EXHIBIT 1

third party or breach of this Agreement and/or any IO(s).

b.  <u>Indemnification Procedures</u>. A Party's (the "Indemnifying Party") obligations to indemnify the other Party (the "Indemnified Party") with respect to any claim, action or proceeding shall be conditioned upon the Indemnified Party: (i) providing the Indemnifying Party with prompt written notice of such claim, action or proceeding, in any case, no later than 10 days from first learning of such claim, action or proceeding and (ii) cooperating at the Indemnifying Party's request and expense with the defense or settlement of such claim, action or proceeding which cooperation shall include providing reasonable assistance and information. No Indemnified Party shall enter into any settlement agreement for which it will seek indemnification under this Agreement from the Indemnifying Party without the prior written consent of the Indemnifying Party. Nothing herein shall restrict the right of a Party to participate in a claim, action or proceeding through its own counsel and at its own expense.

10. **<u>Limitation of Liability</u>.**

IN NO EVENT WILL ISI BE LIABLE TO THE SERVICE PROVIDER FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE, INDIRECT OR SPECIAL DAMAGES SUCH AS, BY WAY OF EXAMPLE AND NOT LIMITATION, LOST REVENUES OR LOST PROFITS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH ISI'S TOTAL LIABILITY FOR ANY OR ALL LOSSES OR INJURIES FROM ITS ACTS OR OMISSIONS UNDER THIS AGREEMENT, REGARDLESS OF THE NATURE OF THE LEGAL OR EQUITABLE RIGHT CLAIMED TO HAVE BEEN VIOLATED, SHALL NOT EXCEED THE AMOUNT PAID BY ISI TO SERVICE PROVIDER UNDER THIS AGREEMENT OR THE APPLICABLE INSERTION ORDER 12 MONTHS PRECEDING THE CLAIM.  THIS LIMITATION OF LIABILITY SHALL APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND NOTWITHSTANDING THE FAILURE OF ANY LIMITED REMEDY.

11. **<u>REPRESENTATIONS AND WARRANTIES</u>.** Both Parties agree, represent, and warrant that:

a.  The execution of this Agreement and its performance hereunder are not in breach of any agreement that it may have with a third party nor will it violate the proprietary rights, privacy rights, legal rights or interests of any third party in the performance of its obligations under this Agreement.

b.  Entering into this Agreement and performance hereunder or contemplated by this Agreement shall not violate any applicable law, rule, regulation, or other binding legal authority including but not limited to any law of any jurisdiction of the world which is intended to protect the security of information or privacy rights of individuals;

c.  It shall not impersonate any person or entity, or misrepresent its affiliation with any person or entity;

d.  It will comply with, and assist in complying with, all consumer requests applicable to any IO which are received by one Party and provided to the other Party including, but not limited to, requests not to share information available to certain consumers under the California Consumer Privacy Act, and other such requests as applicable;

e.  It shall use the Deliverables and Leads in such a way as not to violate any applicable law, cause harm, abuse, deceive, embarrass or damage to any individual consumer, and it shall expressly comply with all opt-out requests presented by consumers;

f.  It is a validly formed entity in good standing under the laws of its state in which it is organized or otherwise formed, has obtained all licenses, registrations, and approvals necessary to conduct business



EXHIBIT 1

and otherwise perform under this Agreement, and will comply with all applicable laws, statutes, ordinances, rules and regulations;

g.   Its execution of this Agreement and its performance hereunder are not in breach of any agreement that it may have with a third party nor will it violate the proprietary rights or interests of any third party; and

h.   It shall comply with all consumer requests applicable to one Party which are received by the other Party and provided to it including, but not limited to, requests not to share or sell information available to certain consumers under the California Consumer Privacy Act, and other such requests as applicable.

12.   **RESTRICTED PERSONS; RESTRICTED USE.** Service Provider represents and warrants that Service Provider: (i) is not located in, under the control of, or a national or resident of any country to which the United States has embargoed goods or services; (ii) is not identified as a "Specially Designated National;" by the Office of Foreign Assets Control; (iii) is not placed on the S. Commerce Department's Denied Persons List, and (iv) is not engaged in nuclear, missile, chemical or biological weapons activities to which U.S. persons may not contribute without a U.S. Government license. If Service Provider's status changes with respect to any of the foregoing during the term of this Agreement, Service Provider shall notify ISI within 24 hours, and ISI shall have the right to immediately terminate this Agreement without liability or penalty and shall have no further obligations to Service Provider. Any waiver of the foregoing by ISI shall only be effective if given expressly and in writing. If Service Provider is ever in violation of this Section, ISI shall have the right to immediately terminate this Agreement without liability or penalty and shall have no further obligations to Service Provider. Service Provider may not, directly or indirectly, import, export, or allow the export or re- export of the same, including, but not limited to, technical data, in violation of any applicable restrictions, laws, rules or regulations of any applicable country.

13.   **NO HIRE.** During the term of this Agreement and for a period of one year following its termination, Service Provider and each of its affiliates and representatives shall not and shall notattempt to solicit, hire, retain, contract with, encourage, entice, promote, incentivize, or otherwise engage any employee, officer, director, or agent of ISI (collectively, "Employee") to work, become employed by, or contract with Service Provider, to cease or reduce their relationship with ISI, or to otherwise alter their relationship with ISI in any way that is or may be detrimental to ISI as determined by ISI in ISI's sole discretion. Notwithstanding the foregoing, independent action of ISI personnel to general advertisements or general solicitations by Service Provider shall not be considered a violation of this Section. If Service Provider breaches or violates the provisions of this Section, Service Provider agrees to pay ISI liquidated damages in an amount equal to the two years' base salary or two times the annual fee payable to that Employee plus the recruitment costs incurred by ISI in replacing such Employee.

14.   **ASSIGNMENT.** Neither this Agreement nor any interest, duty, right, or obligation herein shall be assigned, delegated, or transferred by either Party without prior written consent of the other Party which shall not be unreasonably withheld. Any such attempted or actual delegation, assignment, or transfer shall be deemed null and void. Further, each Party represents and warrants that it shall not attempt or cause such assignment, transfer,or delegation.

15.   **REMEDIES.** Remedies under this Agreement are cumulative and election of one remedyby ISI shall not preclude or prevent the election of other remedies by ISI.

16.   **SUCCESSORS IN INTEREST.** This Agreement shall be binding upon and inure to the benefit of the successors in interest and assigns of each Party to this Agreement, so long as such succession or assignment is in accordance with this Agreement.

DocuSign Envelope ID: 3509DC79-C5E4-4EBC-A7BA-97C49E4094B9

**11**



EXHIBIT 1

17. **RESERVATION OF RIGHTS.** ISI reserves all rights not expressly granted to Service Provider in this Agreement. Except for the limited rights expressly granted under this Agreement, nothing in this Agreement grants, by implication, waiver, estoppel, or otherwise, to Service Provider or any third party any intellectual property rights or other right, title, or interest in or to ISI's Intellectual Property.

18. **ENTIRE AGREEMENT.** This Agreement, including any exhibits or IO(s) attached or relating hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof and expressly supersedes and governs against all other prior agreements, terms, negotiations, and understandings, both written and oral.

19. **WAIVER OR MODIFICATION.** No delay or omission by ISI in the exercise of any rights or remedies under the Agreement constitutes a waiver of such right or remedy. A consent or approval of an act does not waive or render unnecessary the consent or approval of any other or subsequent act. No waiver, alteration, or modification of any of the provisions of this Agreement or the IO(s) shall be binding unless in writing and signed by duly authorized representatives of both Parties wherein such writing states the parties' intent to modify this Agreement or an applicable IO. A check-box, "acceptance by use" or "automatic" acceptance of such terms provided by Service Provider shall not constitute sufficient acceptance and shall not bind ISI.

20. **NOTICES.** Notices under this Agreement shall be deemed to be adequate and sufficient if given in writing and delivered via: (a) registered or certified mail, postage prepaid, in which case notice shall be deemed to have been received three (3) business days following deposit to U.S. mail; (b) a nationally recognized overnight air courier, next day delivery, prepaid, in which case such notice shall be deemed to have been received one (1) business day following delivery to such nationally recognized overnight air courier; or (c) electronic mail, in which case such notice shall be deemed to have been received upon the earlier of one (1) business day of successful delivery to the applicable address or upon confirmation of receipt either by electronic means or a response to or otherwise indicating confirmation of receipt of such electronic mail. All notices shall be addressed to the contacts set forth in this Agreement or the applicable IO. Either Party shall give the otherparty written notice of a change of address.

*To ISI*:
*Insurance Supermarket Inc.*
*1951 NW 7th Ave #600*
*Miami, Florida*
*33136*
*ATTN: Contracts/Compliance*

*With email copy to*: *mickey.rubin@isi.ca*

*To Service Provider*:
EDM Leads LLC
_____
1166 E Warner Rd
_____
Gilbert, AZ 85296
_____
Jamal English
_____

_____

21. **GOVERNING LAW.** This Agreement shall be exclusively governed by the laws of the State of Delaware without giving effect to conflict of law principles. The parties hereby consent to jurisdiction in the State of Delaware and agree that the American Arbitration Association shall have exclusive jurisdiction over any disputes or issues regarding the interpretation or enforcement of this Agreement and shall be resolved exclusively by arbitration under the then current Commercial Arbitration rules of the American Arbitration Association. Venue for arbitration shall be in the State of Delaware. Each Party, without limitation, agrees that such venue is convenient, consents to such venue, and waives any defense to such venue. Venue for litigation shall be exclusively in the nearest court of appropriate jurisdiction in the State of Delaware. The Parties acknowledge and agree that this Agreement relates



EXHIBIT 1

solely to the performance of services (not the sale of goods) and, accordingly, will not be governed by the Uniform Commercial Code of any state having jurisdiction and shall not be governed by the United Nations Convention on the International Sale of Goods.

22. **FORCE MAJEURE.** Neither Party shall be responsible for any failure to perform (except for payment obligations) due to unforeseen circumstances or to causes beyond its control, including but not limited to acts of God, war, riot, embargoes, acts of civil or military authorities, earthquakes, fire, floods, accidents, strikes, shortages of transportation facilities, fuel, energy, labor or materials or failures of telecommunications or electrical power supplies. A party whose performance is affected by a force majeure event shall be excused from such performance to the extent required by the force majeure event so long as such party takes all reasonable steps to avoid or remove such causes of nonperformance and immediately continues performance whenever and to the extent such causes are removed. Both Parties shall use all reasonable efforts to overcome or work around the force majeure event as soon as reasonably practicable. A force majeure event may not include the failure to pay monies to the other Party.

23. **AUTHORITY.** Both Parties represent and warrant (a) that it has the authority to enter into this Agreement and (b) that the individual signing this Agreement on behalf of the Party is authorized to do so.

24. **COUNTERPARTS.** This Agreement may be executed in two or more counterparts, eachof which shall be deemed to be an original but all of which shall constitute one and the same agreement.

25. **HEADINGS.** The headings and captions used in this Agreement are provided solely forconvenience and shall not convey any legal right, interest, or obligation upon either party.

26. **SEVERABILITY.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, such provision shall be restated to become enforceable while remaining as close as possible to the intent of the parties hereto. Should such modification be impossible, or if such modification would be contrary to the intent of the parties hereto, such unenforceable, illegal, or void provision shall be deemed stricken from this Agreement, as if it had never existed. In either event, the remaining provisionsshall remain in full force and effect.

27. **SURVIVAL.** In the event that this Agreement is terminated, the obligations set forth in this Agreement shall survive termination of this Agreement, as well as all other terms the survival of which is necessary to give effect to their intent.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Master Services Agreement to be executed as of the Effective Date.

EDM Leads LLC
_____

By:  *Jamal English*

Typed Name:  Jamal English
Title:  CEO
Date: 1/27/2022

Insurance Supermarket Inc.

By:  *Mickey Rubin*

Typed Name:  Mickey Rubin
Title  CMO, VP of PMO
Date: 1/28/2022

**DocuSign**<sup></sup>

## Certificate Of Completion

EXHIBIT 1

Envelope Id: 3509DC79C5F44EBCA7BA97C49E4094B9                          Status: Completed
Subject: Please DocuSign: 2022 ISI Master Service Agreement.pdf
Source Envelope:
Document Pages: 12                    Signatures: 2                Envelope Originator:
Certificate Pages: 5                  Initials: 0                 Heather McIntyre
AutoNav: Enabled                                                 1192 Eagles Watch Trl
EnvelopeId Stamping: Enabled                                     Miami, FL  33136
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                heather@isi.ca
                                                                 IP Address: 99.255.144.245

## Record Tracking

Status: Original                      Holder: Heather McIntyre           Location: DocuSign
       1/27/2022 5:12:39 PM                   heather@isi.ca

| Signer Events | Signature | Timestamp |
|---|---|---|
| Jamal English<br>jamal@edmleadnetwork.com<br>CEO<br>EDM Leads LLC<br>Security Level: Email, Account Authentication (None) | *Jamal English*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 68.108.219.65 | Sent: 1/27/2022 5:16:12 PM<br>Viewed: 1/27/2022 5:20:36 PM<br>Signed: 1/27/2022 5:23:15 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 1/27/2022 5:20:36 PM<br>   ID: 47c8cfe5-2ac9-48be-80f9-aff0c4d487e9 | | |
| Mickey Rubin<br>mickey.rubin@isi.ca<br>CMO<br>Insurance Supermarket<br>Security Level: Email, Account Authentication (None) | *Mickey Rubin*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 142.126.149.196 | Sent: 1/27/2022 5:16:12 PM<br>Viewed: 1/28/2022 11:42:47 AM<br>Signed: 1/28/2022 11:42:57 AM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 1/28/2022 11:42:47 AM<br>   ID: a2c43435-d51b-479b-8e70-8011a712213a | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Heather McIntyre<br>heather@isi.ca<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 1/27/2022 5:16:12 PM<br>Resent: 1/28/2022 11:43:01 AM<br>Viewed: 1/27/2022 5:26:58 PM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

EXHIBIT 1

**14**

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/27/2022 5:16:12 PM |
| Certified Delivered | Security Checked | 1/28/2022 11:42:47 AM |
| Signing Complete | Security Checked | 1/28/2022 11:42:57 AM |
| Completed | Security Checked | 1/28/2022 11:42:57 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

EXHIBIT 1    **15**

E-signature Consent: PLEASE READ THIS NOTICE CAREFULLY AND PRINT OR DOWNLOAD A
COPY FOR YOUR FILES.

**CONSENT TO USE ELECTRONIC SIGNATURES AND RECEIVE DISCLOSURES THROUGH**

ELECTRONIC MEANS
You have initiated a transaction with Assurity Life Insurance Company (referred to as "Assurity", "Us" or
"We") and Insurance Administrative Services (referred to as "IAS", "Us", or "We") using electronic
records and signatures. Before proceeding, We ask for your consent to do business electronically and
provide you with disclosures and other information ("Required Information") relating to insurance you
may apply for with Us or that you have with Us, now or in the future. If you consent, We may deliver
Required Information to you electronically. Your consent also allows Us to use electronic records and
signatures in this and future transactions unless and until you withdraw consent. We may still send some
notices to you in paper at your regular mailing address. For this reason, it is important that you inform
IAS of any changes to your regular mailing address.
When you receive an email from Us at your email address documenting a transaction or alerting you to
take action, you agree to promptly review the email and take any action requested in the email. From
time to time We may distribute important materials electronically, including your policy, notifications
regarding payments due, and other important notices.
Your rights relating to the insurance you purchase from Us may be dependent on when you receive
certain information from Us. You are considered to have received information from Us when We notify
you at your email address documenting the transaction or alerting you that information is waiting for you
on the website or web portal described in the email. We may still send some notices to you in paper at
your regular mailing address.

**DISCLOSURES AND CONSENT TO USE OF ELECTRONIC SIGNATURES**

By proceeding and electronically signing this document, you agree to Assurity's use of electronic records

and electronic signatures in transactions with you. You further consent to receive electronic versions of
certain records from Assurity or IAS, including Required Information and any notices, disclosures, or
other documents related to your transaction.
You further agree that your consent will be legally binding and enforceable, just as if you had signed on
paper, and acknowledge that you will download, save and/or print items submitted to you electronically
under this consent for your records and safekeeping. If you have any trouble downloading or printing any
item, you may contact IAS toll free at (800) 774-3065.
If you wish to change the e-mail address where We send the notices and disclosures to you, you must
update your email by calling IAS at the phone number listed above.
Your consent is voluntary and may be withheld, in which case you should not proceed and should instead
submit a paper transaction request by mail or contact IAS at the toll-free number above to receive
assistance. Further, after you have provided consent, you are entitled to change your mind. Consent may
be withdrawn by notifying IAS in writing at PO Box 96, Minneapolis, MN 55440-0096 after which it may
take a few days for IAS to reflect the change internally. Withdrawal of consent may also result in some
processing delay or the need for you to complete new forms on paper.
If your transaction is an application for insurance and you still want IAS to process the application
electronically but also want a paper copy, you should consent to proceed electronically and then contact
IAS toll free at (800) 774-3065, to request a paper copy, which will be provided free of charge. If your
transaction does not involve an insurance application, you will receive an email regarding the transaction
at your registered email address, sometimes followed by a written communication in the mail.
The computer hardware and software used to access this page on the Internet is all you will need to
access the documents associated with your transaction, including service request forms, claim forms, and
applications for insurance (as well as related notices, disclosures, authorizations, acknowledgements and
other documents provided to you in electronic form). To retain copies of these documents, you should (1)
print them from this website, (2) email them to an address where you can print them on paper, or (3) save
an electronic copy onto a computer with at least 100 megabytes of memory.

**17**

EXHIBIT 1

If you do not have the required software and/or hardware, or if you do not wish to use electronic records
and signatures for any other reason, you can ask IAS to send you paper copies of the document(s)
instead. IAS may require that certain communications from you be delivered on paper at a specified
address.

**STATEMENT OF CONSENT**

By clicking "I Agree", I certify that:
• I have accessed, reviewed, and agree to this "Consent to Use Electronic Signatures and Receive
Disclosures Through Electronic Means;" and
• I have an account with an Internet service provider and I am able to send email and receive email
with hyperlinks to websites and attached files; and
• Unless and until I notify IAS as described above, I consent to receive all Required
Information, notices and disclosures relating to the transaction through electronic means; and
• I also consent to the use of electronic signatures on all documents completed as part of the
transaction, instead of handwritten signatures; and
• If applicable, I am authorized to consent to the transaction and the use of electronic signatures on
behalf of any minors whose signature may otherwise be required.